UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 11-60088-CR-COHN

UNITED STATES OF AMERICA,

vs.

BENJAMIN RAND,

              Defendant.
_____/

## REPORT AND RECOMMENDATION ON DEFENDANT'S "MOTION TO DISMISS: NO CHILD PORNOGRAPHY" (DE 50), "MOTIONS TO SUPPRESS: RIGHT TO COUNSEL" (DE 55), "MOTIONS TO SUPPRESS: STATEMENTS" (DE 56) AND "MOTIONS TO SEVER COUNTS" (DE 57)

THIS CAUSE is before the Court on the "Motion to Dismiss: No Child Pornography" (DE 50), the "Motions to Suppress: Right to Counsel" (DE 55), the "Motions to Suppress: Statements" (DE 56), and the "Motions to Sever Counts" (DE 57), all filed by Benjamin Rand ("Defendant"), and were referred to United States Magistrate Judge Barry S. Seltzer pursuant to 28 U.S.C. § 636 and the Magistrate Rules of the Local Rules of the Southern District of Florida (DE 63). For the reasons set forth below, the undersigned recommends that each motion be DENIED.

## I.      PROCEDURAL HISTORY

On July 21, 2011, a grand jury returned a seven-count Superseding Indictment (DE 30) charging Defendant with two counts of production of child pornography, in violation of 18 U.S.C. § 2251(a), two counts of receipt of child pornography, in violation of 18 U.S.C. § 2252(a)(2), two counts of using a computer to entice a minor to engage in sexual activity, in violation of 18 U.S.C. § 2422(b), and one count of possession of child pornography, in

violation of 18 U.S.C. § 2252(a)(4)(B). The alleged victims are 14-year old CR as to Counts One through Three, 16-year old AG as to Counts Four through Six, and 11-year old MS and 16-year old BS as to Count Seven.

On August 23, 2011, Defendant filed the instant dispositive motions: "Motion to Dismiss: No Child Pornography" (DE 50); "Motions to Suppress: Right to Counsel" (DE 55); "Motions to Suppress: Statements" (DE 56); "Motions to Sever Counts" (DE 57).[1] And on September 8, 2011, the Government responded to each (DE 67, 68, 69). On September 23, 2011, the undersigned received testimony and heard argument on the motions.

The motions are now ripe for decision.

II.    FACTS

The undersigned received testimony from Pembroke Pines Police Department ("PPPD") Detectives Paul Andres and Robert Scopa, both of whom are veteran law enforcement officers and members their agency's Sex Crimes Child Abuse Unit. After considering their testimony, the undersigned found their accounts of the pertinent events highly credible. The undersigned also reviewed in its entirety the 52-minute video recording of Defendant's April 7, 2011 police interview, which interview is the subject of Defendant's motions to suppress. And the undersigned has considered the Government's factual proffer in its responses to the motions.

A.    Background

The Government proffered that on or about March 19, 2011, PPPD detectives

---

[1] In addition to the above-referenced dispositive motions, Defendant filed seven non-dispositive motions on August 23, 2011 (DE 49, 51, 52, 53, 54, 58, 59). Those non-dispositive motions are the subject of separate orders.

responded to a report of a forcible rape committed against a 14-year old minor, CR. This minor, CR, told the PPPD detectives that she had become involved with Defendant Benjamin Rand, a 20-year old former friend of her older brother. According to the Government, at age 18, Defendant had been convicted and sentenced to jail for crimes involving child pornography. After completing his sentence, Defendant was released and returned to the Broward County area. Shortly thereafter, Defendant and CR began communicating with one another via text messaging.

Over the next few months, Defendant and CR communicated through text messages and phone calls. The conversations were often flirtatious or suggestive. Shortly after their on-line relationship began, Defendant asked CR to take and send him pictures of herself, using her cell phone. CR complied and sent clothed pictures of herself to Defendant, and he likewise sent clothed pictures of himself to CR.

At some point, Defendant began asking CR to take and send him nude pictures of herself, using her cell phone. Although CR was reluctant to do so, she eventually acquiesced. CR would go into her bathroom and take nude pictures of herself in front of the bathroom mirror; she would then send the pictures to Defendant's cell phone. Defendant would often text CR with requests of how she should pose in the pictures, including asking her to use her fingers to spread open her vagina. CR complied with this request. These requests were made on several occasions over a period of one year, with at least four occasions being in February and March of 2011. On the last occasion that CR sent Defendant pictures, in March 2011, Defendant requested that the pictures be of CR inserting her fingers or another object into her vagina. CR complied with this request and sent Defendant images of herself inserting a marker into her vagina. CR said she

3

immediately deleted the images from her phone, and she believed that Defendant had done the same.

In December 2010, Defendant asked CR to meet him personally; she agreed. They met in Defendant's car behind a restaurant in Pembroke Pines. According to CR, during this encounter, Defendant pulled down her pants and inserted his penis into her vagina. Although CR was a virgin, she did not object to engaging in sexual intercourse with Defendant at this time. However, after this meeting, CR began to avoid contact with Defendant, often ignoring his messages, which appeared to anger him. At some point, Defendant threatened to create a website on which he would post all the naked pictures of CR; he also threatened to send the website link to CR's family. CR was frightened that Defendant would follow through on these threats. Therefore, she continued sending to Defendant text messages, as well as the naked pictures of herself that Defendant repeatedly requested.

On March 19, 2011, Defendant repeatedly texted CR, asking that she meet with him again behind the same Pembroke Pines restaurant. Although CR initially refused, she eventually relented and agreed to meet Defendant in his car behind the restaurant. Once inside his car, Defendant tried to have sex with CR, but she refused. CR will testify that Defendant then raped her: he pulled down her pants while she screamed, he covered her mouth with his hand, and he inserted his penis into her vagina. CR will testify that Defendant did not stop until he had ejaculated inside her. After this violent encounter, Defendant forced CR out of his car and reportedly shouted, "Have fun with my baby, bitch."

CR returned home to her grandmother's house and told her family that she had just been raped by Defendant. CR's parents contacted the PPPD; medical services were then

4

contacted. CR was taken to the Sexual Assault Treatment Center ("SATC") and given a rape examination. Semen was found inside her vagina and a sample was taken for DNA testing. The results of the DNA examination have confirmed that the semen found inside CR's vagina on the evening of March 19 is that of Defendant Benjamin Rand.

B.     The March 20, 2011 Interview

In the early morning hours of March 20, 2011, PPPD officers located Defendant and asked him to return to the police station with them to answer questions. He was not placed under arrest. Defendant agreed, and he returned to the police station where he was interviewed by Officer Martin and Detective Wetterer; the entire interview was video recorded. Prior to being questioned, Defendant was read his Miranda rights and given a Miranda rights form, which he signed after agreeing to answer questions. See Miranda Rights Form dated March 20, 2011, Ex. A to Government's Response (DE 67-1). The interview focused primarily on Defendant's relationship with CR and the allegations that he had raped her on March 19, 2011. Defendant was questioned about and admitted to asking for and receiving naked pictures of CR. He also admitted to threatening to show the naked pictures to others if CR did not continue to do as he asked. During the interview, Defendant provided written consent for the police to take custody of and to search his cellular telephone.

At some point in the interview, the officers advised Defendant that Detective Scopa was returning to the police station and had some additional questions to ask him. Detective Scopa had been with CR at SATC and wanted to talk with Defendant about CR's allegations. Defendant was invited to sit with the officers outside the interview room while they waited for Detective Scopa. But when Detective Scopa arrived, Defendant advised

5

that he would like an attorney to be present. At that time, Detective Scopa terminated the meeting without asking any questions. Defendant was then placed under arrest and charged with two counts of lewd or lascivious battery (arising out of the December and March incidents, in which Defendant engaged in sexual intercourse with CR, a minor) and with one count of lewd or lascivious molestation (arising out of March incident, in which Defendant forcibly raped CR, a minor).

According to Defendant's motions, on March 20, 2011, he was released on bond and on March 29, 2011, his counsel made a formal appearance in the state court. Motion to Suppress at 1-2 (DE 55).

C.      Results of Forensic Examination

A subsequent forensic examination of Defendant's cell phone revealed over 200 deleted images, many depicting children in sexually explicit positions. In particular, numerous sexually explicit images of CR taken on different days were found on Defendant's phone. In addition, numerous sexually explicit images of other unidentified females were recovered from the phone, including images of minor AG taken when she was 16 years old, images of minor MS taken when she was 11 years old, and images of BS taken when she was 16 years old. According to the Government, these images of MS and BS were some of the same images that were the subject of Defendant's 2008 juvenile adjudication.[2]

---

[2] The Government proffered the following facts concerning Defendant's 2008 juvenile adjudication. On September 12, 2008, he was adjudicated in the Department of Juvenile Justice, Broward County, Florida, for the crimes of possession of photographs of sexual performance by a child and lewd and lascivious behavior toward a victim aged 12 to 16. These charges arose in 2008 after multiple images of nude minors in sexually explicit poses, including MS and BS, were found on Defendant's computer, cell phone, and other

After AG was identified, she was interviewed by PPPD detectives. AG stated that she had met Defendant on a social networking site in January 2011 and began communicating with him via text messages and phone calls. Shortly thereafter, Defendant began asking AG to send him sexually explicit images of herself. AG claims that she initially resisted, but Defendant was persistent; she eventually acquiesced and sent Defendant images of her exposed buttocks and breasts. According to AG, a week or two after meeting him, Defendant brought AG back to his house and forced her to have sexual intercourse with him. Following this incident, she continued to see Defendant and send him images of herself for the next several weeks. She did so because he was persistent and because she was afraid he would show her images to others or tell people that they had had sex.

D.    The April 7, 2011 Interview

On April 7, 2011, Defendant was arrested at his home by members of the PPPD, including Detectives Scopa and Andres. More specifically, the arrest was on charges related to the images that had been found on the Defendant's cell phone: four counts of soliciting a child for unlawful sexual conduct using computer services or other devices (arising out of the four separate occasions on which Defendant had utilized a cell phone to solicit CR to take sexually explicit images); one count of lewd or lascivious conduct

digital media. The allegations made by MS and the other minor victims in 2008 are virtually identical to the claims made by CR and AG in 2011. The evidence in the 2008 case evidence established that Defendant had coerced minor female girls into sending him sexually explicit images and then threatened to expose the images to others if the minors did not continue to send him additional images or to engage in sexual activity with him. Defendant pled no contest to the charged offenses, was adjudicated delinquent, and was committed to the Broward Regional Detention Center for a term of one year. Government's Response to Defendant's Motion (DE 57) to Sever Counts at 5-6 (DE 68).

(arising out of Defendant's solicitation of CR take naked images of herself in a lewd manner); one count of using a child in a sexual performance (arising out of Defendant's use of CR to engage in a sexual performance); and one count of extortion (arising out of Defendant's threats to CR).

Defendant was transported to the PPPD for processing.  While there, Detective Andres asked Defendant if he would be willing to answer questions regarding the images that had been found on his cell phone.  Detective Andres had known Defendant from his previous work as a School Resource Officer at Defendant's high school.  Detective Andres described their relationship as "cordial" and "friendly."[3]   Detective Andres advised Defendant that he did not want to talk about the case stemming from the March 19, 2011 incident with CR, but rather wanted to go through the images that had been found on Defendant's cell phone to see if, with Defendant's help, the females in the images could be identified.  Detective Andres reviewed with Defendant each of his rights as set forth on a Waiver of Rights Form.  Defendant placed a notation on the form as Detective Andres reviewed each right.  When Detective Andres arrived at the final question on the form, which asks whether "[k]nowing and understanding Your Rights as I have explained them to you, are you willing to answer my questions without an attorney present," Defendant

---

[3] At the hearing, Detective Scopa testified that before any questioning of Defendant began, he consulted with the State Attorney's Office.  Detective Scopa specifically asked whether it would be permissible to question Defendant, given that he had invoked his right to counsel at the close of the March 20, 2011 interview.  Detective Scopa was advised that if the April 7, 2011 arrest was for different charges and if more than 14 days had elapsed since the prior interview, then the police could attempt to re-interview Defendant.  Detectives Scopa and Andres decided that it would be better for Detective Andres to interview Defendant because Defendant had declined to speak to Detective Scopa on March 20 and because Detective Andres already had a rapport with Defendant.

paused; he took several minutes to consider the question and the rights that he would be waiving.  As Defendant was considering the matter, Detective Andres advised Defendant to take his time.  After a minute or two of silence, Detective Andres commented that owning up to wrongdoing is a part of the healing process; Detective Andres further commented that Defendant could, if he wished, stop the questioning at any time he wished.  Defendant paused further to consider the matter.  Defendant then agreed to waive his rights and to execute the Waiver of Rights Form.  The form made clear that "[a]nything you say can and will be used against you in a court of law."  See Miranda Rights Form of April 7, 2011, Ex. B to Government's Response (DE 67-2).  The interview was video-recorded.

During the interview, Detective Andres and Defendant reviewed all the images found during the forensic examination of Defendant's cell phone.  Many of the images were of young females in various stages of dress and in sexually explicit poses.  Defendant identified several of the females depicted in the images by name, even when those images did not depict a female's face.  Defendant then wrote their names on the back of the images, and he initialed them.  He also sorted the images into separate piles.  Among the images that Defendant identified were those of victims CR, AG, MS, and BS.  Defendant also answered questions concerning how he had obtained the images from the females.

At no time during the interview did Detective Andres raise his voice or threaten Defendant; rather, Detective Andres was business-like in his demeanor and respectful of Defendant. At no time during the interview did Defendant ask to speak to an attorney, to make a telephone call, to stop the questioning, to leave the interview room, or to use the restroom. Twenty minutes into the interview, Defendant did ask for water, and Detective Andres proceeded to provide Defendant with a bottle of water and a package of peanut

9

butter crackers.  Significantly, at no time during the interview did Detective Andres ask Defendant any questions concerning the events of March 19, 2011, or his alleged sexual assault of CR.

## III.   DEFENDANT'S MOTIONS

Defendant filed the four instant (dispositive) motions on August 23, 2011 (DE 50, 55, 56, 57). The motions are addressed (below) in the order in which they were docketed.

### A.   MOTION TO DISMISS: NO CHILD PORNOGRAPHY (DE 50)

Defendant argues that "the images produced by the government and reviewed to date in discovery by the defense have failed to depict images of child pornography." Motion at 2 (DE 50).  More specifically, Defendant seeks to dismiss the counts of the Superseding Indictment involving child pornography – Counts One, Two, Four, Five, and Seven – on the grounds that the images at issue do not constitute a "lascivious exhibition of the genital or pubic area" and, therefore, as a matter of law, do not depict "sexually explicit conduct" pursuant to 18 U.S.C. § 2256. Motion at 3-4 (DE 50). The Government responds that it has made available to Defendant all the images depicting child pornography that it intends to use at trial and that these images include sexually explicit images of CR, AG, MS, and BS that constitute child pornography.  Response at 2 (DE 69). The Government has also identified the specific pornographic images that it will seek to introduce at trial.

Defendant's argument is ill-timed; the argument is not one properly made to the court on a pre-trial motion to dismiss, but one properly argued to a court or to a jury at trial. The Federal Rules of Criminal Procedure limit those matters that a party may properly raise by pretrial motion to "any defense, objection, or request that the court can determine

10

without trial of the general issue." Fed. R. Crim. P. 12(b)(2). Because the "general issue" involves evidence relevant to the question of guilt or innocence, see United States v. Barletta, 644 F.2d 50, 58 (1st Cir. 1981), a pretrial motion to dismiss cannot be based on a sufficiency of the evidence argument; such an argument raises factual issues embraced in the general issue. United States v. Mann, 517 F.2d 259, 267 (5th Cir. 1975).[4] And although the Federal Rules do authorize a court to enter a judgment of acquittal of any offense for which evidence is insufficient to sustain conviction, a court may do so only "[a]fter the government closes its evidence or after the close of all the evidence." Fed. R. Crim. P. 29(a). In sum, the Federal Rules of Criminal Procedure do not authorize a pretrial motion to dismiss – in effect, a pretrial motion for acquittal – predicated on an alleged insufficiency of the evidence. See United States v. Salman, 378 F.3d 1266, 1268 (11th Cir. 2004); see also United States v. Critzer, 951 F.2d 306, 307 (11th Cir. 1992). (stating that "[t]here is no summary judgment procedure in criminal cases").

Rather than for a court before trial, it is for a jury at trial to decide whether certain images meet the statutory definition of child pornography and, more specifically, whether those images depict a "lascivious exhibition of the genitals." See e.g., United States v. Rayl, 270 F.3d 709, 714 (8th Cir. 2001); United States v. Knox, 32 F.3d 733, 747 (3rd Cir. 1994) ("we adhere to the view that 'lasciviousness' is an inquiry that the finder of fact must make"); United States v. Arvin, 900 F.2d 1385, 1388 (9th Cir. 1990) ("While it is arguable that the pictures are not, in fact, lascivious, the district court did not err in refusing to

---

[4] In Bonner v. City of Prichard, Ala., 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted as binding precedent the decisions of the Fifth Circuit rendered prior to October 1, 1981.

dismiss the indictment on this basis. The issue of lasciviousness was properly allowed to go to the jury.").

Accordingly, the undersigned respectfully RECOMMENDS that Defendant's "Motion to Dismiss: No Child Pornography" (DE 50) be DENIED.

B.  MOTIONS TO SUPPRESS: RIGHT TO COUNSEL (DE 55) AND MOTIONS TO SUPPRESS: STATEMENTS (DE 56)

Defendant moves to suppress his April 7, 2011 statements to Detective Andres on the grounds that were not voluntarily given and were taken in violation of his Fifth, Sixth, and Fourteenth Amendment rights. Motion to Suppress: Right to Counsel at 3 (DE 55); Motions to Suppress: Statements at 1 (DE 56). More specifically, Defendant argues that the April 7, 2011 statements warrant suppression because prior to that date he had invoked his right to counsel (on March 20, 2011), had appeared with counsel for release on bond for the initial charges, and had had his counsel file a notice of appearance. Motions to Suppress: Right to Counsel at 2-3 (DE 55). He further argues that his statements warrant suppression because his "will was overborne by the officers' trickery." Motions to Suppress: Statements at 3 (DE 56). The undersigned, however, does not agree that any of these bases warrant suppression of Defendant's statements.

1.  Fifth Amendment Right to Counsel During Custodial Interrogation

The Fifth Amendment, which has been made applicable to the states through the Fourteenth Amendment, see Malloy v. Hogan, 378 U.S. 1, 7 (1964), provides that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." U.S. Const., amend. V. In Miranda v. Arizona, 384 U.S. 436 (1966), the Supreme Court held that to protect a suspect's Fifth Amendment rights from the "inherently compelling

12

pressures" of custodial interrogation, law enforcement personnel must warn a suspect prior to questioning of his right to remain silent and of his right to the presence of counsel. Id. at 444, 467. Where the suspect indicates that he wishes to remain silent, the interrogation must cease, and where he indicates that he desires counsel, the interrogation must cease until an attorney is present. Id. at 473-74. A suspect may waive these rights. But for such a waiver to be valid, it must be shown that the waiver was knowingly, intelligently, and voluntarily given. Id., 384 at 475.

In Edwards v. Arizona, 451 U.S. 477 (1981), the Supreme Court determined that when a suspect had previously requested counsel, at any subsequent interrogation additional safeguards were warranted to protect that suspect's right to have counsel present. According to the Edwards Court, once an accused has invoked his right to counsel, he "is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges or conversations with the police." Id. at 484-85. The "Edwards rule, moreover, is not offense specific:  Once a suspect invokes the Miranda right to counsel for interrogation involving one offense, he may not be reapproached regarding any offense unless counsel is present." McNeil v. Wisconsin, 501 U.S. 171, 177 (1991) (citations omitted) (emphasis in original).

In Maryland v. Shatzer, 130 S. Ct. 1213 (2010), the Supreme Court addressed its concern that where a suspect had been arrested and held in uninterrupted pretrial custody, that suspect might easily be "coerced or badgered into abandoning his earlier refusal to be questioned without counsel." Id. at 1220 (citations omitted).  But the Shatzer Court distinguished cases involving uninterrupted pretrial custody from those in which a suspect

13

has been "released from his pretrial custody and has returned to his normal life for some time before the later attempted interrogation." Id. at 1221.

> In those circumstances, it is far fetched to think that a police officer's asking the suspect whether he would like to waive his Miranda rights will any more "wear down the accused," . . . than did the first such request at the original attempted interrogation – which is of course not deemed coercive. His change of heart is less likely attributable to "badgering" than it is to the fact that further deliberation in familiar surroundings has caused him to believe (rightly or wrongly) that cooperating with the investigation is in his interest.

Id. (citations omitted). The Court ultimately held that the Edwards presumption of coercion dissipates 14 days following release from Miranda custody, reasoning that the 2-week period "provides plenty of time for the suspect to get reacclimated to his normal life, to consult with friends and counsel, and to shake off any residual coercive effects of his prior custody." Id. at 1223. In sum, confessions obtained after a two-week break in custody and a waiver of Miranda rights are not likely to be compelled. Id.

Here, on March 20, 2011, Defendant asserted his right to counsel at the conclusion of the PPPD interview; he was arrested and released on bond later that same day. Thereafter, Defendant returned to his home, his family, and his normal life. On April 7, 2011, he was arrested on new and different charges, and he again waived his Miranda rights and made a statement. Because Defendant experienced a break in Miranda custody of more than 2 weeks – more specifically, 18 days – between his first and second interviews, the Edwards presumption of coercion had dissipated. The April 7, 2011 interview, therefore, did not run afoul of Supreme Court's Fifth Amendment guidelines governing police interviews subsequent to a defendant's invocation of Miranda rights.

14

## 2. Sixth Amendment Right to Counsel During Adversarial Proceedings

The Sixth Amendment of the United States Constitution guarantees to all criminal defendants the right to the assistance of counsel. U.S. Const. amend. VI. A defendant's Sixth Amendment right to counsel attaches "at or after the initiation of adversary judicial proceedings – whether by way of formal charge, preliminary hearing, indictment, information, or arraignment." Kirby v. Illinois, 406 U.S. 682, 688-89 (1972). By contrast, the mere filing of a complaint and the issuance of an arrest warrant does not create a Sixth Amendment right. United States v. Langley, 848 F.2d 152, 153 (11th Cir. 1988) (citing United States v. Gouveia, 467 U.S. 180, 190 (1984)).

Unlike the Fifth Amendment (Miranda) right to counsel, the Sixth Amendment right to counsel is strictly offense-specific; even though an individual is in jail on a charged offense for which he has counsel, law enforcement may question that individual concerning a crime that has not been formally charged. McNeil, 501 U.S. at 175; accord Texas v. Cobb, 532 U.S. 162, 165 (2001) (holding that despite relationship between two charges, Sixth Amendment protection had not attached to questioning defendant about murders of occupants of residence, even after he had previously been indicted for burglary of occupants' residence and appointed an attorney); see United States v. Shea, 211 F.3d 658 (1st Cir. 2000) (defendant's statements to informant-inmate about a bank robbery for which he had not been charged, made while incarcerated for another bank robbery for which he was represented, did not violate Sixth Amendment right to counsel). The rule makes no exception for uncharged crimes that may even be factually related to the charged offense. Cobb, 532 U.S. at 168.

But for an individual to be lawfully questioned about an uncharged crime (after he

15

has invoked his Sixth Amendment right to counsel), the uncharged crime must not constitute the "same offense," as the Supreme Court defined that term in the Blockburger decision: "'where the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one, is whether each provision requires proof of a fact which the other does not.'" Cobb, 532 U.S. at 173 (quoting Blockburger v. United States, 284 U.S. 299, 304 (1932)). Stated differently, "when the Sixth Amendment right to counsel attaches, it . . . encompass[es] offenses that, even if not formally charged, would be considered the same offense under the Blockburger test." Cobb, 532 U.S. at 173.; see Gore v. Sec'y for Dep't of Corrs., 492 F.3d 1273, 1306 n.73 (11th Cir. 2007) (charges on which defendant was questioned "were sufficiently distinct" from charges over which his Sixth Amendment rights attached). Accordingly, when a defendant is questioned about a separate uncharged offense, it is incumbent upon him to invoke his Fifth Amendment right to counsel as to the uncharged offense, notwithstanding his earlier Sixth Amendment invocation. Cobb, 532 U.S. at 171-72.

The Sixth Amendment right to counsel is further circumscribed by the "dual sovereignty doctrine," as state and federal prosecutions for the identical offense are distinct for purposes of the Sixth Amendment. See United States v. Knight, 562 F.3d 1314, 1327-28 (11th Cir. 2009) (observing that the "dual sovereignty doctrine" applies to the right to counsel under the Sixth Amendment); United States v. Avants, 278 F.3d 510, 518 (5th Cir. 2002) ("It is plain to see that the federal and state murder prosecutions against [the defendant] are not the 'same offense' under the Sixth Amendment because each was initiated by a separate sovereign."). "[A]n invocation of the right to counsel for a state

16

charge does not invoke the right for an identical federal charge." Knight, 562 F.3d at 1328. Therefore, a defendant's confession, taken in violation of his Sixth Amendment right to counsel while under state indictment, may be admitted in a subsequent federal prosecution, as the defendant's right to counsel did not attach with respect to the federal charges. See id. ("[The defendant] did not invoke his right to counsel for the federal charges against him, and there is no evidence that [the defendant] had obtained counsel to represent him on the federal charges. The district court did not err when it denied [the defendant's] motion to the suppress statements he made to [the law enforcement agent]."); Avants, 278 F.3d at 518.

Preliminarily, the undersigned notes that (under the Blockburger test) the March 20, 2011 charges, for which Defendant's Sixth Amendment right to counsel had attached, are not the same as the April 7, 2011 charges, which are at issue here. On March 20, 2011, Defendant was charged with  two counts of lewd or lascivious battery[5] and one count of lewd or lascivious molestation.[6]  These charges related to the December and March incidents of sexual contact between Defendant and CR.  By contrast, Defendant's April 7, 2011 arrest and charges related solely to the images that were recovered from his cell phone and to his threats to publish those images:  four counts of soliciting a child for

---

[5] Under Florida law, to prove the crime of lewd or lascivious battery (Fla. Stat. § 800.04(4)(b)), it must be established that the victim was under the age of 16 and the defendant encouraged, forced, or enticed the victim to engage in any act involving sexual activity.

[6] Under Florida law, to prove the crime of lewd or lascivious molestation (Fla. Stat. § 800.04(5)), it must be established that the victim was older than 12 but less than 16, the defendant was 18 years of age or older, and the defendant intentionally touched in a lewd or lascivious manner the breasts, genitals, or buttocks of the victim or the clothing covering them.

unlawful sexual conduct using computer services or other devices[7] (representing four separate occasions on which Defendant used a cell phone to solicit CR to take sexually explicit images); one count of lewd or lascivious conduct[8] (for Defendant's solicitation of CR take naked images of herself in a lewd manner); one count of use of a child in a sexual performance[9] (for Defendant's use of CR to engage in a sexual performance); and one count of extortion[10] (for Defendant's threats made to CR).

Here, after Defendant invoked his right to counsel for the March 20, 2011 state charges, he appeared in court with his attorney on those charges and was released on bond. Eighteen days later, on April 7, 2011, Defendant was arrested on state charges

---

[7] Under Florida law, to prove the crime of soliciting a child for unlawful sexual conduct using computer services or other devices (Fla. Stat. § 847.0135(3)(a)), it must be established that the defendant knowingly used a computer online service, Internet service, local bulletin board service, or any other device capable of electronic data storage or transmission to seduce, solicit, lure, or entice, or attempt to seduce, solicit, lure, or entice, a child or another person believed by the person to be a child, to commit any illegal act described in chapter 794, chapter 800, or chapter 827, or to otherwise engage in any unlawful sexual conduct with a child or with another person believed by the person to be a child.

[8] Under Florida law, to prove the crime of lewd or lascivious conduct (Fla. Stat. § 800.04(6)), it must be established that the victim was less than 16 years of age, the defendant either (a) intentionally touched the victim in a lewd or lascivious manner; or solicited the victim to commit a lewd or lascivious act, and the defendant was 18 years of age or older.

[9] Under Florida law, to prove the crime of use of a child in a sexual performance (Fla. Stat. § 827.071(2)), it must be established that defendant employed, authorized or induced the victim to engage in a sexual performance, the defendant knew the character and content of the performance and, at the time, the victim was less than 18 years of age.

[10] Under Florida law, to prove the crime of extortion (Fla. Stat. § 836.05) it must be established that the defendant, either verbally or by a written or printed communication, maliciously threatened to expose another to disgrace, or to expose any secret affecting another, or to impute any lack of chastity to another, with intent to compel the person to do any act against that person's will.

relating to the images found on his cell phone and transported to the PPPD for questioning; the instant federal charges pertaining to those images, however, had not yet been filed. At the police station, he was asked by Detective Andres if he would be willing to answer questions regarding the images. Detective Andres advised Defendant of his constitutional rights, including his right to counsel, and Defendant waived those rights. Detective Andres specifically informed Defendant that he did not want to discuss the charges for which he had been arrested on March 20, 2011. Rather, he wanted to review the images that had been found on Defendant's cell phone to see if, with Defendant's help, the females in the images could be identified. Defendant agreed and signed a Waiver of Rights Form. At no time during the interview did Defendant ask to speak with his attorney or with any attorney. Defendant was not asked any questions about the incidents in which he is alleged to have engaged in sexual activity with CR in December 2010 and on March 19, 2011; nor was Defendant asked any questions concerning or his alleged sexual assault of CR. Because the April charges (relating to images of CR found on Defendant's phone and his threats to publish the images) require proof of facts that the March charges (relating to Defendant's acts of engaging in sexual activity with CR in December 2010 and March 19, 2011) do not, Detective Andres' April interview was for new and distinct crimes; Defendant's Sixth Amendment right to counsel had not yet attached with respect to these new crimes.

Furthermore, even if Defendant's Sixth Amendment right to counsel had attached with respect to all the state charges, by operation of the dual sovereignty doctrine his confession would still be admissible in the pending federal matter. The (initial) federal indictment was not filed until April 21, 2011 (DE 1). Therefore, as of April 7, 2011, there were no federal charges with respect to which Defendant could have invoked his Sixth

Amendment right to counsel. As his right to counsel had not attached with respect to the subsequently filed federal charges, there is no Sixth Amendment basis for suppressing Defendant's April 7, 2011 statements. See Knight, 562 F.3d at 1328.

### 3. Voluntariness of April 7, 2011 Statement

The United States Code stipulates that a confession is admissible in evidence "if it is voluntarily given." 18 U.S.C. § 3501(a). To ensure that a confession is voluntarily given, the Supreme Court in Miranda v. Arizona adopted a set of prophylactic measures to protect a suspect's Fifth Amendment right from the "inherently compelling pressures" of custodial interrogation; law enforcement must warn a suspect prior to questioning that he has the right to remain silent and the right to an attorney. 384 U.S. 436, 444, 467 (1966). Although a defendant may waive his right to remain silent, any waiver must be voluntary, knowing, and intelligent. Id. at 436; see Knight, 562 F.3d at 1327 (concluding that that the defendant had "waived his right to remain silent, and his waiver was voluntary, knowing, and intelligent"). To determine whether the waiver is valid, a court must look to the totality of the circumstances – both the characteristics of the accused and the details of the interrogation. Schneckloth v. Bustamonte, 412 U.S. 218, 226 (1973); accord Mincey v. Arizona, 437 U.S. 385, 399-401 (1978) (factual inquiry must center upon the conduct of law enforcement officials in creating pressure and the suspect's capacity to resist that pressure).

Defendant has alleged that he did not relinquish his right to silence voluntarily. The Supreme Court has explained that "[t]he relinquishment of the right [to silence] must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion or deception." Colorado v. Connelly, 479 U.S. 157, 170 (1986)

20

(citation omitted). Coercive conduct normally involves subjecting an accused to an exhaustively long interrogation, applying physical force or threatening to do so, or making a promise that induces a confession. Id. at 163.

As the hearing testimony made clear, Defendant was arrested at his home on April 7, 2011, and transported to the police station. While Defendant was being processed, Detective Andres asked him if he would be willing to answer questions regarding the new charges for which he had just been arrested to see if he could identify any of the unknown females depicted in the images. Detective Andres specifically advised Defendant that he did not have to answer any questions and that the decision was his to make. Before any substantive questioning of Defendant began, Detective Andres provided Defendant with a statement of rights form, and he specifically informed Defendant of each of his Miranda rights. Further, Detective Andres asked Defendant to acknowledge each right and to answer each question on the form in writing. He then asked Defendant to sign the bottom of the form, acknowledging that he understood his rights. Defendant did so. See Waiver of Rights Form, Ex. B to Government's Response (DE 67-2).

The entire interview was recorded and lasted approximately 52 minutes. Only Detective Andres was present with Defendant in the interview room. Detective Andres informed Defendant what he wanted to discuss with him – the photos recovered from his cell phone. Nothing about the questioning was deceptive. Nothing was coercive. No threats were made. No voices were raised. To the contrary, Detective Andres was business-like and respectful throughout the interview. Considering the totality of the circumstances, the undersigned concludes that Defendant voluntarily waived his right to remain silent, and his waiver was the product of free choice, rather than intimidation,

coercion, or deception. Further, Defendant was aware of both the nature of the rights he was waiving and consequences of his decision to do so.

Defendant has argued that Detective Andres overcame his will, as he was only 20 years old and had just graduated from high school. Defendant, however, was not the naive youngster that he now suggests. According to the Government, school records show that Defendant last attended high school in 2008, that is, 3 years before the interview with Detective Andres. In the interim, Defendant had become acquainted with the criminal justice system. He was adjudicated in the Department of Juvenile Justice of possessing photographs of a sexual performance by a child and lewd and lascivious behavior toward a victim aged 12 to 16, charges similar in nature to those charged in the instant indictment. Defendant pled no contest to those charges, was adjudicated delinquent, and committed to the Regional Detention Center for one year. Significantly, when he was arrested in 2008 on the state charges, Defendant waived his Miranda rights and provided a statement to law enforcement.

Further, during his March 20, 2011 video-taped statement, Defendant commented that he had been questioned in the same room for his 2008 case. And on March 20, 2011, Defendant was again given the option to waive his Miranda rights, and he again elected to do so and to provide a statement, although later that day he elected to invoke his rights and request counsel. By the time of his April 7, 2011 statement, Defendant had not only had substantial involvement in the criminal justice system, but he was familiar with his rights and with his choice to waive or to invoke those rights.

Finally, in support of his argument that Detective Andres overcame his will, Defendant made several unsubstantiated allegations in his motions. He erroneously stated

22

that Detective Andres had been a truant officer at his high school and that on one occasion involving a dispute between Defendant and a teacher, Detective Andres drove him around in his patrol car all day rather than file charges against him. And he alleged that Detective Andres was not even assigned to investigate the crimes charged here and was only brought into the case to overcome Defendant's will. According to Defendant's motions, he believed that Detective Andres would again overlook the evidence and not file charges against him, as he had allegedly done when Defendant was in high school.

The hearing testimony, however, did not substantiate Defendant's allegations. Although Detective Andres testified that he had been a resource officer at Defendant's high school, Detective Andres made clear that at no time did he ever allow Defendant into his patrol car or drive him around, and he had no recollection of ever involving himself in any of Defendant's disciplinary matters. In addition, Detective Andres made clear that he had been assigned for three years to the PPPD's Sex Crimes-Juvenile Unit and worked closely with Detective Scopa. This testimony was not rebutted or impeached in any manner. In addition, nothing in the video tape remotely indicates that Defendant actually believed the charges would be waived if he cooperated with Detective Andres. In fact, at the close of the interview, Defendant specifically asked Detective Andres if the charges for which he had just been arrested would result in life imprisonment, and Detective Andres responded that the charges were very serious. The fact that Defendant elected to provide a statement to a detective – Andres – with whom he had a rapport in no way suggests that his will was overcome or that his statement was involuntary. Indeed, had he been approached by the detective whom he had previously rebuffed – Scopa – Defendant may well have argued that he was being harassed.

In sum, Defendant cannot establish that his age, maturity level, familiarity with his legal rights, or any other factor caused his April 7, 2011 statement to be coerced, involuntary, or otherwise taken in violation of his rights. As of April 7, 2011, Defendant was a 20-year man who had previously been incarcerated for similar offenses and who had twice previously waived (and once invoked) his Miranda rights and given statements to PPPD detectives. And on April 7, 2011, he was again – for the fourth time – advised of his Miranda rights, which he elected to waive. He responded in writing to each of the enumerated rights and signed the rights form indicating that he was willing to make a statement and that he knew what he was doing. The totality of the circumstances, therefore, compels the conclusion that Defendant's waiver of his Miranda rights and his subsequent statements were knowingly, intelligently, and voluntarily given.

### 4.    Conclusion

Defendant's April 7, 2011 statement to Detective Andres did not violate either his Fifth Amendment or Sixth Amendment rights, nor was the statement involuntarily given. Accordingly, the undersigned respectfully RECOMMENDS that the "Motions to Suppress: Right to Counsel" (DE 55) and the "Motions to Suppress: Statements" (DE 56) be DENIED.

### C.    MOTIONS TO SEVER COUNTS (DE 57)

Defendant moves to sever Counts One through Three of the Superseding Indictment, which relate to victim CR, from Counts Four though Six, which relate to victim AG, from Count Seven, which relates to victims MS and BS. See Motion to Sever Counts at 1-2 (DE 57). In effect, Defendant seeks three separate trials on the indictment.

The Court must engage in a two-step inquiry to determine whether separate counts are properly tried at the same time. See United States v. Walser, 3 F.3d 380, 385 (11th Cir.

24

1993). First, the Government must establish that joinder is proper under Federal Rule of Criminal Procedure 8(a). Id. And second, the Court must exercise its discretion under Federal Rule of Criminal Procedure 14 to determine whether the defendant would be prejudiced were the properly-joined counts not severed. United States v. Montes-Cardenas, 746 F.2d 771, 776 (11th Cir. 1984).

       1.     Joinder

In pertinent part, Rule 8(a) provides that "[t]he indictment . . . may charge a defendant in separate counts with 2 or more offenses if the offenses charged . . . are of the same or similar character, or are based on the same act or transaction, or are connected with or constitute parts of a common scheme or plan." Fed. R. Crim. P. 8(a) (emphasis added).  According to the Eleventh Circuit, "similar" character means "[n]early corresponding; resembling in many respects; somewhat alike; having a general likeness." Walser, 3 F.3d at 385 (internal quotations and citation omitted).  Furthermore, when offenses are joined under Rule 8(a) by virtue of their "same or similar character," they need only be similar by category, not in evidence. See United States v. Hersh, 297 F.3d 1233, 1241 (11th Cir. 2002).  The similarity can be apparent from the face of the indictment or by the Government's pretrial representations, provided that those representations are borne out by the evidence at trial. United States v. Dominguez, 226 F.3d 1235, 1240-41 (11th Cir. 2000).  Courts generally construe Rule 8 broadly in favor of initial joinder. Montes-Cardenas, 746 F.2d at 776.

The Eleventh Circuit's decision in Hersh, 297 F.3d 1233, is instructive.  In that decision, the court found that counts charging the defendant with child pornography could properly be jointed with counts charging him with conspiring to travel in foreign commerce

25

and transporting a minor in foreign commerce with intent to engage in criminal sexual activity. According to the Hersh Court, both sets of counts are "similar" in that they reflect the defendant's "repeated participation in the sexual exploitation of minors" and they involve "the extraordinary mistreatment of children." Id. at 1242.

Likewise, the charges in the Superseding Indictment before this Court are "similar" as they all involve the sexual exploitation of children: enticement of a minor, production of child pornography, and possession of child pornography relating to four minor female victims. Indeed, Defendant is alleged to have engaged with each victim in virtually identical conduct – coercing and persuading minor females into sending him sexually explicit images of themselves and then preying on their fears that he would expose the images to coerce them to send additional images and, in some instances, to engage in sexual activity with him.[11] Because the seven counts in the instant indictment are "similar" within the meaning of Rule 8(a), they are properly joined.

### 2.    Severance

Where counts are properly joined, courts must proceed to the second step and assess the prospective prejudice and the corresponding propriety of severance. Federal Rule of Criminal Procedure 14(a) provides that "the court may order separate trials of

---

[11] Although similarity need only be by category, the undersigned notes that in this case the evidence relating to CR may also be admissible on the charges relating to AG and to MS/BS, as the evidence as to each victim is inextricably intertwined. See United States v. Castro, 89 F.3d 1443 (11th Cir. 1996) (when facts underlying each offense are so closely connected that proof of such facts is necessary to establish each offense, joinder of offenses is proper). The evidence as to each victim would also be admissible as to the other victims under Federal Rules of Evidence 413, 414, and 404(b). In particular, Rues 413 and 414 operate under a presumption that evidence of prior sexual assault or child molestation is admissible. In addition, all the victim evidence establishes a continuous pattern of conduct by Defendant from February 2008 to March 2011.

counts" where the joinder of offenses in an indictment "appears to prejudice a defendant." Fed. R. Crim. P. 14(a).   That a defendant would have a better chance of acquittal in a separate trial does not alone warrant a severance. United States v. Serpico, 320 F.3d 691, 696 (7th Cir. 2003); United States v. Houle, 237 F.3d 71 (1st Cir. 2001).   To warrant a severance, a defendant must satisfy the "heavy burden" of showing "compelling prejudice"; mere conclusory allegations will not satisfy the burden. Walser, 3 F.3d at 386; see also United States v. Knowles, 66 F.3d 1146, 1159 (11th Cir. 1995) (requiring showing of "specific and compelling prejudice," resulting in "fundamental unfairness").   The Eleventh Circuit has set forth the test for assessing "compelling prejudice":

> The test for assessing compelling prejudice is whether under all the circumstances of a particular case it is within the capacity of jurors to follow a court's limiting instructions and appraise the independent evidence against a defendant solely on that defendant's own acts, statements, and conduct in relation to the allegations contained in the indictment and render a fair and impartial verdict.  If so, "though the task be difficult," there is no compelling prejudice.  Moreover, if the possible prejudice may be cured by a cautionary instruction severance is not required.

Walser, 3 F.3d at 386-87 (citations omitted).   As part of this assessment, the court must balance the defendant's right to a fair trial against public's interest in the "efficient and economic administration of justice," United States v. Baker, 432 F.3d 1189, 1236 (11 Cir. 2005), weighing the likelihood of prejudice to the defendant against the interest of judicial economy, United States v. Wolford, 614 F.2d 516, 518 (5th Cir. 1980).

Despite his allegations, Defendant has not shown that a trial on all counts would deny him a fair trial or inflict upon him "compelling prejudice."  Defendant contends that because the counts relating to CR have forensic data and the counts relating to AG

(allegedly) do not, he could not argue the lack of forensic evidence as to AG while also arguing the unreliability of the forensic evidence as to CR. In effect, he makes an antagonistic defense argument, speculating that the jury would be unable to fairly evaluate the evidence as to CR and AG separately. His contention, however, is not persuasive.

First, Defendant's predicate for the contention – the Government lacks forensic evidence as to AG – appears false. The Government proffered in its written Response, and reiterated at the hearing, that as to AG it possesses numerous phone records and images retrieved from Defendant's phone. According to the Government, these records and images "will be submitted at trial to demonstrate the <u>hundreds of phone and text connections</u> between the defendant and AG, as well as images of AG that the defendant received during the period charged in the indictment." Government's Response to Defendant's Motion (DE 57) to Sever Counts at 12 n.3 (DE 68) (emphasis added). Second, even if the evidence as to each victim were to differ, such a difference would in no way impair the ability of a jury to follow the court's cautionary instructions to evaluate the evidence as to each count separately. If requested, the Court can simply instruct the jury that it can find guilt on a particular count only where the Government meets all of the elements for that count. See <u>Walser</u>, 3 F.3d at 387 ("[I]f the possible prejudice may be cured by a cautionary instruction severance is not required."). And it is a fundamental tenet of our jury system that juries are presumed to follow the instructions given to them by a court. See <u>Marshall v. Lonberger</u>, 459 U.S. 422, 438 n.6 (1983); <u>United States v. Stone</u>, 9 F.3d 934, 938 (11ᵗʰ Cir. 1993) ("Few tenets are more fundamental to our jury trial system than the presumption that juries obey the court's instructions.").

Defendant contends that without a severance he "may become confounded in

28

presenting separate defenses." Motion to Sever at 2 (DE 57). Yet, he has failed to satisfactorily explain why presenting different types of defenses here would be contradictory. Even if, as Defendant (incorrectly) assumes, the Government possesses no forensic evidence as to AG, there would be no inconsistency in his arguing the absence of reliable forensic evidence as to either victim: as to CR, the forensic evidence is unreliable, and as to AG, the forensic evidence is non-existent. Defendant, therefore, has not shown that his defenses would be sufficiently contradictory to warrant severance, particularly as the Government's evidence as to each count is similar and occurred close in time.[12] To the extent that there may exist some theoretical risk of prejudice, he has not explained why such risk could not be cured with a proper instruction from the Court.

In addition, Defendant contends that he "may wish to testify in his own behalf on one of the offenses but not the other, forcing him to chose [sic] the unwanted alternative of testifying as to both or testifying as to neither." Motion to Sever at 2 (DE 57). Yet, severance is not required "simply because a defendant indicates that he wishes to testify on some counts but not others." United States v. Forrest, 623 F.2d 1107, 1115 (5th Cir. 1980) (citation omitted). To establish that a joinder of counts prevents him from testifying, a defendant must show that the "charges are distinct in time, place, and evidence, that there was 'important' evidence that he might have offered on one set of charges but could not, and that he had a 'strong need' not to testify on the other counts." Hersh, 297 F.3d

---

[12] Even were Defendant able to establish a need to present mutually antagonistic defenses – a need that Defendant has not established here – such need alone would not require severance as a matter of law. See Zafiro v. United States, 506 U.S. 534, 538-39 (1993) (discussing that joinder resulting in prejudice to defendant does not make mutually antagonistic defenses prejudicial per se or require severance whenever prejudice is shown).

29

at 1243 (citation omitted). Defendant has not made such a showing here, either in his motion or at the hearing.

Finally, the undersigned notes that were the Court to sever the counts, as Defendant requests, the Government's law enforcement witnesses would be required to provide the same or similar testimony at three separate trials. Because all of the counts will be proved, in part, with evidence retrieved from Defendant's cell phone, as well as from the circumstances of his March 20 and April 7, 2011 arrests, judicial economy weighs strongly against severance in this case.

In sum, Defendant has not satisfied the "heavy burden" of showing the "compelling prejudice" that would warrant a Rule 14 severance. Absent particularized facts indicating that a jury would be unable to follow appropriate limiting instructions and fairly evaluate the evidence against him as to each count, Defendant's severance argument fails. Accordingly, the undersigned respectfully RECOMMENDS that the Motion to Sever Counts (DE 57) be DENIED.

IV. CONCLUSION

For the foregoing reasons, the undersigned respectfully RECOMMENDS that the Court DENY the following motions filed by Defendant Benjamin Rand: "Motion to Dismiss: No Child Pornography" (DE 50); "Motions to Suppress: Right to Counsel" (DE 55); "Motions to Suppress: Statements" (DE 56); and "Motions to Sever Counts" (DE 57).

The parties will have seven (7) days[13] from the date of being served with a copy of

---

[13] Rule 4 of the Magistrate Judge Rules, Local Rules for the Southern District of Florida, requires that a party file any objections to a magistrate judge's report and recommendation with fourteen days of being served "or within such other time as may be allowed by the Magistrate Judge or District Judge." S.D. Fla. L. R. (Magistrate Judge Rule

this Report and Recommendation within which to file written objections, if any, with the Honorable James I. Cohn, United States District Judge.  Failure to file objections timely shall bar the parties from a de novo determination by the district judge of an issue covered in the report and shall bar the parties from attacking on appeal factual findings accepted or adopted by the district judge except upon grounds of plain error or manifest injustice. See 28. U.S.C. § 636(b)(1); Nettles v. Wainwright, 677 F.2d 404, 410 (5th Cir. Unit B 1982) (en banc).

DONE and SUBMITTED at Fort Lauderdale, Florida this 26 day of September 2011.

BARRY S. SELTZER
United States Magistrate Judge

Copies furnished to:

Honorable James I. Cohn
United States District Judge

All counsel of record

---

4). Where exigencies exist, a court may shorten the time for filing objections. See United States v. Barney, 568 F.2d 134, 136 (9th Cir. 1978) (holding that trial court did not err in providing parties less than the [then-applicable] full ten-day period to file objections to the magistrate's report and recommendation where exigencies existed, stating that the [then-applicable] "[t]en days is a maximum, not a minimum"); Hispanic Counseling Center, Inc. v. Incorporated Village of Hempstead, 237 F. Supp. 2d 284, 290 (E.D.N.Y. 2002) (court may shorten time period for filing objections where exigencies exist). Exigencies exist in this case – Defendant's calendar call is scheduled for October 19, 2011, and his trial is scheduled for the period commencing October 24, 2011 (DE 43).